[Cite as *State v. Wilkins*, 2026-Ohio-2971.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| | : | Case No. 25CA4126 |
| Plaintiff-Appellee, | : | |
| | : | |
| v. | : | |
| | : | DECISION AND JUDGMENT |
| RAYMOND H. WILKINS, | : | ENTRY |
| | : | |
| Defendant-Appellant. | : | |
| | : | **RELEASED: 07/21/2026** |

APPEARANCES:

George L. Davis, IV, Portsmouth, Ohio, for appellant.

Shane A. Tieman, Scioto County Prosecuting Attorney, and Jay S. Willis, Assistant Scioto County Prosecuting Attorney, Portsmouth, Ohio, for appellee.

Wilkin, J.

{¶1} This is an appeal of a Scioto County Court of Common Pleas judgment entry in which Raymond H. Wilkins ("Wilkins") was convicted of trafficking in a fentanyl-related compound, trafficking in cocaine, and having weapons while under disability. On appeal, Wilkins submits that the trial court erred by denying his motion to suppress. After reviewing the parties' arguments, the record, and the applicable law, we find Wilkins's sole assignment of error lacks merit and therefore affirm the trial court.

BACKGROUND

{¶2} On November 7, 2023, U.S. Marshals and the Southern Ohio Organized and Major Crimes Task Force attempted to serve an indictment on Michael Spradlin at 1603 7th Street, Portsmouth. Also with the task force was Scioto County Probation Officer Gearhart. The task force surrounded the home and then approached the front door.

Task force member Craig Martin, the team leader, knocked on the door.  Sergeant Randy Walters of the task force was right behind Martin.  Mitchell Waring—described as a "very nervous white male,"—opened the door, and Gearhart recognized him as a felony probationer.  Waring opened the door in such a way that he was partially in the door, partially out of the door, with his hand behind his back, which raised officer-safety concerns that he might have a firearm.  Gearheart told the task force members that Waring needed to be detained because Waring was not compliant with probation.

{¶3} Once task force members detained Waring, Martin began talking to Wilkins.  Wilkins, an African American male, identified himself as somebody who had lawful permission to be at the residence.  Wilkins gave Martin consent for task force members to enter the residence to look for Spradlin.  Based upon Wilkins's consent to search for Spradlin, task force members entered the residence and did a limited search, searching for the person of Spradlin.

{¶4} Walters, who has extensive experience in investigating drug possession and drug trafficking, immediately noticed a trash can with a "decent amount" of currency on top of the trash.  In addition, the marshals and task force noticed in plain view, digital scales containing residue on a table, multiple clear plastic baggies, a small spoon with residue, and other drug paraphernalia.  As a result, task force members secured an affidavit for a search warrant, which was signed by a judge.  Subsequently, the search warrant was executed, which led to the seizure of a significant amount of contraband, including narcotics, criminal tools, a firearm, and U.S. currency.

{¶5} On October 1, 2024, a Scioto County Grand Jury returned an indictment alleging Wilkins committed the following offenses:

Count 1:  trafficking in a fentanyl-related compound, F1, with forfeiture and firearm specifications
Count 2:  possession of a fentanyl-related compound, F1, with forfeiture and firearm specifications
Count 3:  trafficking in cocaine, F2, with forfeiture and firearm specifications
Count 4:  possession of cocaine, F2, with forfeiture and firearm specifications
Count 5:  aggravated trafficking in drugs, F3 (methamphetamine)
Count 6:  aggravated possession of drugs, F3 (methamphetamine)
Count 7:  having weapons while under disability, F3
Count 8:  having weapons while under disability, F3
Count 9:  having weapons while under disability, F3
Count 10:  having weapons while under disability, F3
Count 11:  having weapons while under disability, F3
Count 12:  possessing criminal tools, F5

On October 16, 2024, Wilkins was arraigned and entered a plea of not guilty.  Wilkins filed a motion to suppress on November 20, 2024, and a supplemental memorandum in support on December 23, 2024.  On February 24, 2025, the State filed a response to the motion to suppress.

{¶6} The trial court held a suppression hearing on February 26, 2025.  The State called two witnesses –Gearheart and Walters.  The State did not, however, call Martin— the task force member who specifically asked Wilkins for consent to search for Spradlin. Instead, the State presented testimony about the consent through Walters, who was standing directly behind Martin during the incident.  Walters heard the "African American" male, who was on the porch of the residence, give consent.  Walters testified that he unequivocally remembers the "African American" male as "not uncooperative." However, at the time of the hearing, Walters candidly admitted he could not conclusively identify Wilkins as the person who gave the consent, citing the long passage of time between the incident and the hearing.

{¶7} In addition to the State's witnesses, the trial court heard from two defense witnesses – the landlord who owned the premises, and Wilkins himself.  Wilkins testified

that he was renting the 7th Street property at the time of the incident and was present along with Waring.  Wilkins acknowledged that he had a conversation with the task force members at the residence but denied consenting to a search for Spradlin.  He also denied that the items (other than a scale) that the officers claimed they saw in "plain view," were sitting out in the open.

{¶8} The trial court denied the motion to suppress by judgment entry on February 28, 2025.  Wilkins then plead no contest to Count 1, trafficking in fentanyl-related compound, a first-degree felony in violation of R.C. 2925.03(A)(2)(C)(9)(f) (with forfeiture specification); Count 3, trafficking in cocaine, a second-degree felony, in violation of R.C. 2925.03(A)(2)(C)(4)(e) (with forfeiture specification); and Count 10, having weapons while under disability, a third-degree felony, in violation of R.C. 2923.13(A)(3) and 2923.13(B).  The trial court sentenced Wilkins to 8-12 years in prison.

{¶9} Wilkins submitted a timely notice of appeal with one assignment of error.

ASSIGNMENT OF ERROR

I.  THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION TO SUPPRESS.

{¶10} In his sole assignment of error, Wilkins contends that the trial court erred in denying his motion to suppress the evidence obtained after officers secured a search warrant as fruit of the poisonous tree, as he declares that he did not consent to the task force members entering his home to search for Spradlin.  Very specifically, he lists the issue as, "[d]oes competent, credible evidence support the trial court's finding that the Appellant consented to the search of his residence?"  The State responds that the task force members did, indeed, obtain consent before entering the residence to search for

Spradlin and that it presented sufficient evidence at the hearing to demonstrate Wilkins gave officers consent to search for Spradlin.

## A. Law.

{¶11} "Appellate review of a trial court's ruling on a motion to suppress evidence involves a mixed question of law and fact." *State v. Tidwell*, 2021-Ohio-2072, ¶ 18, citing *State v. Burnside*, 2003-Ohio-5372, ¶ 8. "An appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Id.*, citing *State v. Fanning*, 1 Ohio St.3d 19, 20 (1982). "The appellate court must decide questions of law de novo, without deference to the lower court's legal conclusions." *Id.*, citing *Burnside* at ¶ 8.

{¶12} As the Supreme Court of Ohio has explained:

> When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.

(Citations omitted.) *State v. Pleasant*, 2025-Ohio-115, ¶ 61 (4th Dist.), quoting *Burnside* at ¶ 8.

{¶13} The Fourth and Fourteenth Amendments to the United States Constitution, as well as Section 14, Article I of the Ohio Constitution, protect individuals against unreasonable governmental searches and seizures. *Delaware v. Prouse*, 440 U.S. 648, 662 (1979). "[S]earches [and seizures] conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated

exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). "Once the defendant demonstrates that he was subjected to a warrantless search or seizure, the burden shifts to the state to establish that the warrantless search or seizure was constitutionally permissible." *State v. Johnson*, 2014-Ohio-5400, ¶ 13 (4th Dist.) citing *State v. Roberts,* 2006-Ohio-3665, ¶ 98; *Maumee v. Weisner,* 87 Ohio St.3d 295, 297 (1999); *Xenia v. Wallace,* 37 Ohio St.3d 216 (1988), paragraph two of the syllabus.

{¶14} One of the exceptions to the search warrant requirement is if a proper person consents to the search. "Police officers do not need a warrant, probable cause, or even a reasonable, articulable suspicion to search when a suspect voluntarily consents to a search." *State v. Prater,* 2024-Ohio-5367, ¶ 28 (4th Dist.), citing *Schneckloth v. Bustamonte* 412 U.S. 218, 219 (1973); *State v. Comen*, 50 Ohio St.3d 206, 211 (1990). "Consent to a search is 'a decision by a citizen not to assert Fourth Amendment rights.' " *Id.*, citing Katz, Ohio Arrest, Search and Seizure (2004 Ed.), 341, Section 17:1. Additionally, "the Supreme Court has reaffirmed the principle that '[p]olice officers act in full accord with the law when they ask citizens for consent.' " *Id.,* quoting *United States v. Drayton*, 536 U.S. 194, 207 (2002).

{¶15} "To establish the consent exception to the probable cause and warrant requirements of the federal and Ohio constitutions, the State has the burden to establish by 'clear and positive' evidence that 'consent was, in fact, freely and voluntarily given.' " *Prater* at ¶ 29, quoting *Bumper v. North Carolina*, 391 U.S. 543 (1968); *State v. Posey*, 40 Ohio St.3d 420, 427 (1988). " 'Clear and positive evidence' is the substantial equivalent of 'clear and convincing evidence.' " *State v. Stephenson,* 2024-Ohio-624,

¶ 32 (4th Dist.), citing *State v. Debrossard*, 2015-Ohio-1054, ¶ 39 (4th Dist.).  "Clear and convincing evidence" has been defined by the Supreme Court of Ohio as follows:

> The measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal.

*Id.,* quoting *In re Estate of Haynes,* 25 Ohio St.3d 101, 103-104 (1986).  "In reviewing whether the lower court's decision was based upon clear and convincing evidence, 'a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof.' " *Id.,* quoting *Debrossard* at ¶ 39.

{¶16} Further, "whether consent to search is voluntary or the product of duress or coercion is ordinarily a question of fact to be determined from the totality of the circumstances."  *Prater,* 2024-Ohio-5367, ¶ 29 (4th Dist.)*,* citing *Schneckloth*, 412 U.S. at 219, 248-249.  The question is one of "objective" reasonableness- what would the typical reasonable person have understood by the exchange between the officer and the suspect?  *Id.* citing *Florida v. Jimeno*, 500 U.S. 248, 251 (1991), citing *Illinois v. Rodriguez*, 497 U.S. 177, 183-189 (1990).

{¶17} The United States Supreme Court set forth a list of factors for courts to consider in determining whether consent is voluntary, which has long been used by Ohio courts:  (1) the suspect's custodial status and the length of the initial detention; (2) whether the suspect gave consent in public or at a police station; (3) the presence of threats, promises, or coercive police procedures; (4) the suspect's words and conduct; (5) the extent and level of the suspect's cooperation with police; (6) the suspect's

awareness of his right to refuse to consent and his status as a "newcomer to the law";

and (7) the suspect's education and intelligence. *Prater* at ¶ 30, quoting *Schneckloth v.*

*Bustamonte,* 412 U.S. 218, 248-249 (1973); *State v. Ellis,* 2025-Ohio-1014, ¶ 30 (11th

Dist.); *State v. Hartfield,* 2023-Ohio-4708, ¶ 14 (3d Dist.); *State v. Sexton,* 2020-Ohio-

4179, ¶ 36, fn. 2 (12th Dist.); *State v. Fry,* 2004-Ohio-5747, ¶ 23 (4th Dist.); *see also,*

*City of Westlake v. Dudas,* 2020-Ohio-31, ¶ 11 (8th Dist.) and *State v. Moore,* 2019-

Ohio-648, ¶ 23 (2d Dist.) (where Eighth and Second Districts also consider "the

defendant's belief that no incriminating evidence will be found.").

### B.  Analysis

{¶18} The instant case involves a very narrow issue – whether competent,

credible evidence supports the trial court's finding that Wilkins consented to the search

of his residence.  We therefore limit our discussion accordingly.

{¶19} The trial court made the following findings, after hearing evidence from four

witnesses:

> I've had the opportunity to observe the manner and demeanor of the witnesses who have testified, considered their consistency and credibility as I've listened to the testimony.
>
> Some observations about credibility.  Certainly, the testimony of Sergeant Walters was somewhat general in nature when it came to the circumstances of the consent, and made it clear that he had limited recollection based on the passage of time, two years since the time of approaching this residence and looking for Michael Spradlin.  But also made it clear he had a limited purpose for being there, which was to look for Michael Spradlin, although, ultimately that turned into some other actions that was turned over to another agency.

{¶20} The trial court went on to consider the *Bustamante* factors as set forth in

*State v. Fry,* 2004-Ohio-5747, ¶ 23 (4th Dist.).  Specifically, the trial court found:

> The consent was given in a public place, not at the police station. There's no indication of threats, promises, or any coercive activity to obtain that consent. That the Defendant, Mr. Wilkins, was cooperative during his exchange with law enforcement there. That he's had previous involvement with the criminal justice system. * * *And the [c]ourt['s] * * * been unable to consider his exact words and conduct because of the general nature of the consent, as described by Sergeant Walters.

The trial court went on to say that not only has the State shown there was consent, but also shown by "clear and positive" evidence that consent was freely and voluntarily given, and that police officers did not exceed the scope of the consent, but instead waited on the search warrant and local law enforcement to seize the contraband and to actually search the residence for that contraband.

{¶21} A review of the record shows that the State presented testimony at the hearing on the motion to suppress that officers requested limited entry into the residence in order to search for the person in their felony warrant. The State inquired as follows:

> State: Okay. Did you later have a conversation with an individual regarding your ability to go in and look for Mr. Spradlin?

> Task Force Member Walters: I myself, personally, did not have the conversation. My team leader, who was literally standing next to me, was talking to Mr. Wilkins—

> State: Okay.

> Task Force Member Walters: --about the residence.

> State: Do you see Mr. Wilkins in the courtroom today?

> Task Force Member Walters: To be honest with you, it's been two years. I can't positively identify Mr. Wilkins today as we sit here.

> State: Okay.

> Task Force Member Walters: I had very brief interaction with him that day.

State:  Okay.

Task Force Member Walters:  And I just want to be completely transparent and honest.

State:  Sure.  We understand that.  Can you describe this individual that you saw as far as was this a – a Caucasian male, was it an African American male?

Task Force Member Walters:  This was [an] adult African American male.

State:  Okay.  And as you look in the courtroom, does it look to—if you look at the gentlemen who's seated there in the yellow coat, does that appear to be Mr. Wilkins from the best of your recollection?

Task Force Member Walters:  From the best of my recollections, it was an African male was [sic] talking to at the door.

State:  Okay.

Task Force Member Walters:  So, yes.

State:  And did that—

Task Force Member Walters:  Or on the porch, I apologize.

State:  --did that African American individual identify himself as somebody who had lawful permission to be there at the residence?

Task Force Member Walters:  As I recall, yes.

State:  Okay.  And do you recall there being a conversation between Mr. Martin and this African American individual about the ability to go in and look for Mr. Spradlin?

Task Force Member Walters:  Yes.

State:  Do you recall that African American individual giving his consent for you all to make entry into the residence and look for Mr. Spradlin?

Task Force Member Walters:  Yes.

State:  That he did give consent is your testimony?

Task Force Member Walters:  Yes, he did.

During his testimony, Walters emphasized he did not remember verbatim what was said because his focus was trained on the door where a potential threat could lie in the residence.  Later, during cross-examination the following exchange between Wilkins's trial counsel and Walters took place:

> Wilkins's Trial Counsel:   When you say consent was given, was that because you heard it from Mr. Wilkins or because someone else told you that that's what he conveyed?
>
> Task Force Member Walters:  In my recollection, as I'm standing literally just feet away, but understand I'm trained, I'm trying to do multitask, and I do recall that there was consent given, sir[,] by Mr. Wilkins.
>
> Wilkins's Trial Counsel:  Okay.  Thank you.
>
> Task Force Member Walters:  He was not uncooperative.

**{¶22}** After the State rested, Wilkins presented testimony that he himself was the tenant of the property, that he was there at the time that the task force came, and that he had a written lease.  He also categorically denied giving consent.

**{¶23}** "Because a reviewing court should generally defer to a trial court when it acts as the trier of fact, an appellate court should generally defer to a trial court's finding regarding whether a defendant voluntarily consented to a search."  *State v. Miller,* 2012-Ohio-1901, ¶ 24 (4th Dist.), citing *State v. Fry*, 2004-Ohio-5747, ¶ 21 (4th Dist.).  "Thus, appellate courts generally review trial court findings that a defendant voluntarily consented to a search under the weight of the evidence standard set forth in *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990)."  *Id.*  "Even though the state's burden of proof is 'clear and convincing,' this standard of review is highly deferential and the presence of 'some competent, credible evidence' to support the trial court's finding requires us to affirm it."  *Id.,* citing *Schiebel* at 74.

**{¶24}** Here, the record contains some competent, credible evidence to support the trial court's finding. We would note that Wilkins' primary contention is not that any consent was coerced; rather, he claims he never gave consent in the first instance. As the transcript reflects, while Walters did not himself ask Wilkins for consent to search for Spradlin, he was standing right beside task force member Martin, who did ask for consent to search for Spradlin.

**{¶25}** At the hearing, Walters testified that an African American male at the residence identified himself as having lawful permission to be there and was cooperative during the interaction—facts consistent with Wilkins being the tenant on the scene. What could be gleaned by the trial court from the State's evidence was the fact that two persons were at the residence—Waring ("very nervous white male") and Wilkins, who is African American. Task force member Walters was certain that the African American male gave consent and was "not uncooperative." Wilkins himself testified that he was at the residence when the task force came and provided testimony from the landlord that he had a written lease. He also categorically denied giving consent to search for Spradlin. And while Wilkins disputes giving consent, the overlap between his asserted lawful presence and the officer's description of the male who claimed lawful permission places Wilkins as the likely participant in the consent exchange. Further, the trial court applied the relevant *Schneckloth* factors to arrive at the conclusion that the consent was voluntary. Accordingly, we cannot find error.

**{¶26}** We find the sole assignment to be without merit. Therefore, we affirm the trial court.

**JUDGMENT AFFIRMED.**

**JUDGMENT ENTRY**

It is ordered that the **JUDGMENT IS AFFIRMED** and appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. and Hess, J.:  Concur in Judgment and Opinion.

For the Court,

BY: _____
Kristy S. Wilkin, Judge

**NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 22, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**